Graffeo, J. (concurring in part and dissenting in part).
Since 1934, the Superintendent of Insurance has been authorized to review rates charged by health insurance providers (L 1934, ch 595). The majority nonetheless holds that the Superintendent may no longer review rate increases to determine whether they are excessive, inadequate or discriminatory when a health insurance provider uses the “file and use” procedure set forth in Insurance Law § 4308 (g). Because subsection (g) contains no language clearly stripping the Superintendent of this power, I respectfully dissent from that part of the majority’s analysis.
Although I agree with the majority that by adopting the file and use procedure, the Legislature clearly intended to expedite rate increases for certain health insurance providers, I find nothing in the statute or its history supporting the majority’s conclusion that the Legislature also intended to divest the Superintendent of his authority to review rates to determine if they are “excessive, inadequate or unfairly discriminatory” as authorized in Insurance Law § 4308 (b). In fact, the plain language of subsection (g) suggests otherwise. The Legislature merely referred to the file and use methodology as an “alternate procedure” to the lengthy and costly public hearing process required by subsection (c) of the provision. No mention was made of a new standard for reviewing rates—much less the elimination of the Superintendent’s review authority altogether. And, critically, by its plain terms subsection (g) did not supplant or limit the Superintendent’s authority under subsection (b) to review rates to determine whether they are excessive, inadequate or discriminatory.
Like the statutory language, the legislative history is devoid of any indication that the Superintendent’s power to oversee health insurance rates was being diminished. The purpose of the 1995 legislation was to make health insurance more affordable and available for direct pay consumers (see L 1995, ch 504). The legislation created two new standardized health insurance products for these consumers, an HMO plan and a point of ser *175 vice plan, and mandated that such plans be offered by certain health insurance providers, including Excellus. Governor Pataki, who submitted the reform package as part of his insurance program, stated that the legislation was intended to address problems faced by direct pay consumers, who had “limited choices” in health insurance coverage because most insurers did not offer direct pay policies (Governor’s Approval Mem, Bill Jacket, L 1995, ch 504, at 5). As for those consumers who already had insurance, the Governor observed: “Because of continuing rate increases, this critical coverage is becoming more and more expensive for the existing policyholders” (id.).
The streamlined procedure for establishing rate changes was but one aspect of this comprehensive health insurance reform legislation. In discussing the new file and use method, the Governor noted that
“[t]he bill also reforms the costly and time-consuming system for the approval of the premium rates offered by HMOs and Blue Cross Plans on their community-rated business. At the same time, it also preserves certain consumer protections. The adoption of a file and use rating methodology for community rated contracts of HMOs and Article 43 corporations with minimum and maximum loss ratios will yield savings in administrative costs, allow appropriate rate increases to be implemented on a more timely basis and also help assure that rates are equitable” (Governor’s Approval Mem, Bill Jacket, L 1995, ch 504, at 6 [emphasis added]).
It appears that the Governor expected the amendment to create an alternative to the costly, time-consuming public hearing prior-approval procedure of subsection (c) while preserving “consumer protections” that would help assure equitable rates. Since the subsection (b) standard provides the framework for assuring such protections for consumers, I am unpersuaded that the file and use procedure was intended to repeal that subsection—particularly since the Legislature could have easily so provided.
Though not a model of clarity, the statute’s provisions can be read together in a manner that gives meaning to each of its terms and effect to the overriding intent of the 1995 legislation. And where a statute’s terms can be harmonized, the canons of statutory construction require that we do so (see generally, Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals, 97 NY2d *176 86, 91 [2001]). While the majority gives great weight to subsection (g)’s “deemed approved” language,[1] this is just one phrase in a lengthy statute. There is no basis to conclude that the “deemed approved” language vitiates the long-standing “excessive, inadequate or unfairly discriminatory” standard set forth in subsection (b). Both subsections can and should be given effect.
As I read the statute, the 1995 amendment offers insurers a more efficient and cost-effective means of securing rate approval. If rate increases fall within the minimum and maximum loss ratios established in subsection (g), the rates are “deemed approved,” meaning that insurance providers can collect the new rates from consumers. Thus, under the file and use method, the Superintendent is precluded from requiring insurance companies to submit to prior review or approval by the Insurance Department before rate increases go into effect.[2] If the Superintendent decides to exercise his review authority under subsection (b) and finds that the rates are excessive, inadequate or discriminatory, the rates may no longer be charged prospectively, although the Superintendent’s determination can be challenged in a CPLR article 78 proceeding (as occurred in this case).[3] This interpretation of the statute gives effect to all of its terms and is consistent with the history of the reform legislation as a whole and of subsection (g) in particular.
*177 Excellus’ argument that the minimum and maximum loss ratios, used to calculate rates under the file and use procedure, will protect consumers from excessive or discriminatory rates does not withstand scrutiny. In the absence of the Superintendent’s intervention, the file and use procedure has produced HMO rates for direct pay consumers that increased 69.3% between 1999 and 2002 (testimony of Gregory V Serio, Superintendent of Insurance, before the New York State Senate Standing Committee on Insurance, Apr. 15, 2003). The climb in point of service contract rates was even more precipitous: 82.7% during the same time frame (id.).
In addition to resulting in exponential rate increases, the file and use procedure has apparently led to divergences in rates from county to county which, according to the Superintendent, are not justified by regional differences in health care costs. While the loss ratios restrict the percentage of rate increase adopted for a particular plan, they do not require that a provider take a uniform approach to rate increases from plan to plan or region to region. Consequently, as long as rate increases fall within the loss ratios, the file and use procedure does not prevent a provider from increasing rates 50% in one county and not at all in the adjoining county. Absent review, a provider could charge divergent rates without justification and compound the differences in the next filing—even if the rates are patently discriminatory.
Left unchecked, the file and use procedure can lead to precipitous rate fluctuations and unjustified regional discrepancies that could thwart the underlying purpose of the 1995 legislation. While the Superintendent retains the authority to order an independent management and financial audit under the majority’s reading of the statute, audit review may come too late to meaningfully protect direct pay consumers who must meet premium payments each month. If this class of vulnerable insurance subscribers cannot afford the increased rates, they will drop off the insurance rolls and join the ranks of the uninsured—a result completely contrary to the overriding legislative motivation to increase availability of coverage for direct pay consumers.
The Superintendent has alleged that misuse of the file and use procedure was precisely what prompted him to exercise his review authority to reduce Excellus’ rate increases in January 2002. The merits of this determination were never reviewed because the lower courts each concluded that the “deemed ap *178 proved” language divested the Superintendent of rate increase review authority. Because I believe the Superintendent retains authority under subsection (b), I would remit this matter to Supreme Court to assess whether the Superintendent’s prospective alteration of Excellus’ rate increases was arbitrary or capricious, i.e., whether the Superintendent rationally concluded that the provider’s rate increases were excessive, inadequate or discriminatory.
Chief Judge Kaye and Judges G.B. Smith, Ciparick, Rosenblatt and R.S. Smith concur with Judge Read; Judge Graffeo concurs in part and dissents in part in a separate opinion.
Order affirmed, with costs.

. In prior cases, this Court has interpreted a statute containing the phrase “deemed approved” in a manner consistent with and appropriate to its context. For example, in Matter of King v Chmielewski (76 NY2d 182 [1990]), we rejected the argument that a subdivision application was automatically approved by operation of law 45 days after the public hearing even though Town Law § 276 (4) provided that the application would be “deemed approved” if not acted upon within that period. Instead of reading the phrase “deemed approved” in isolation, we considered it in the context of other relevant provisions of law, declining to adopt a narrow interpretation of the statute that “would be inconsistent with the legislative design” (id. at 188; see also, Matter of Sun Beach Real Estate Dev. Corp. v Anderson, 98 AD2d 367 [2d Dept 1983], affd 62 NY2d 965 [1984] [Town Law’s 45-day “deemed approved” provision must be harmonized with SEQRA’s more extended review process]).

. This confers a significant benefit. For several years after the file and use procedure was adopted, the Superintendent apparently saw no need to exercise his review power at all and providers’ rates were not disturbed once filed.

. Given my reading of the statute, I concur with the majority holding insofar as it annuls the Superintendent’s November 2001 letter because it attempted to impose a prior approval requirement on providers who use the subsection (g) file and use procedure. I would also strike that portion of the Superintendent’s rate review determination directing retroactive application of the Superintendent’s rate modifications.